**FILED - GR**
December 26, 2018 12:35 PM
CLERK OF COURT
U.S. DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
BY:__ns__ SCANNED BY: kw / 12/36

## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA<br>ex rel. HEIDI PARENT-LEONARD, | ) ) ) | |
| STATE OF MICHIGAN<br>ex rel. HEIDI PARENT-LEONARD, | ) ) ) | **1:18-cv-1426**<br>Robert J. Jonker<br>Chief U.S. District Judge |
| Plaintiff-Relator, | ) ) ) | |
| v. | ) DOCKET NO. _____<br>) **FILED UNDER SEAL** | |
| FOREST VIEW PSYCHIATRIC<br>HOSPITAL; FOREST VIEW<br>PSYCHIATRIC HOSPITAL, INC.;<br>UNIVERSAL HEALTH SERVICES,<br>INC.; JAHANDAR SAIFOLLIAH, M.D.,<br>and BEHAVIORAL HEALTH CARE,<br>P.C., | ) **Jury Trial Demanded**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | |
| Defendants. | ) | |

## COMPLAINT

1.      Relator Heidi Parent-Leonard, brings this action on behalf of herself, the

United States of America, and the state of Michigan against Defendants Forest

View Psychiatric Hospital, Forest View Psychiatric Hospital, Inc., Universal

Health Services, Inc. (collectively "Forest View"), and Jahandar Saifollahi, M.D.

for their violations of the federal False Claims Act ("federal FCA"), 31 U.S.C. §§

3729 *et seq*., and of the Michigan Medicaid False Claims Act, M.C.L. 400.601 *et*

1

*seq.* ("Michigan FCA").

2.     As discussed herein, Forest View engaged in policies and practices aimed towards (1) admitting patients who were not qualified for inpatient psychiatric care, and (2) engaging in a self-referral scheme with Dr. Saifollahi in violation of the Stark Law, to the detriment of federal and state-subsidized insurance programs.

3.     As discussed herein, Dr. Saifollahi engaged in policies and practices aimed towards (1) providing medically unnecessary services, (2) upcoding the billing for services he provided, (3) billing for services that were not provided, and (4) referring patients to himself and to Forest View in violation of the Stark Law, to the detriment of federal and state-subsidized insurance programs.

4.     The practices alleged in this Complaint defraud every insurer—both public and private—that reimburses for hospital and physician services at Forest View. Federal and state healthcare programs targeted by Defendants' scheme include Medicare, Medicaid, TRICARE, federal and state workers' compensation programs, and many other programs.

## JURISDICTION AND VENUE

5.     This court has subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1345.

6.     This court has personal jurisdiction over Defendants pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a) in that Defendants do or transact business in this

jurisdiction and the violations of the False Claims Act described herein were carried out in this district.

7.      Venue is proper in this district under 28 U.S.C. §§ 1391(b) and (c) and under 31 U.S.C. § 3732(a).

## COMPLIANCE WITH PROCEDURAL REQUIREMENTS

8.      As required by the federal FCA, 31 U.S.C. § 3730(b)(2), Relator has provided to the Attorney General of the United States and the United States Attorney for the Western District of Michigan a statement of all material evidence and information related to the Complaint ("Disclosure Statement").

9.      As required by the Michigan FCA, Relator has provided the Disclosure Statement to the Attorney General for the state of Michigan.

10.      The Disclosure Statement is supported by material evidence known to Relator at the time of her filing, establishing the existence of Defendants' false claims.

11.      The Disclosure Statement includes attorney-client communications and work product of Relator's attorneys and is submitted to the Attorney General of the United States and the United States Attorney for the Western District of Michigan in their capacities as potential co-counsel in this litigation; therefore, the Disclosure Statement is confidential and protected by the joint prosecutorial privilege.

## PARTIES

12.     Defendant Forest View Hospital is a psychiatric hospital located at 1055 Medical Park Drive SE, Grand Rapids, MI 49546.

13.     Forest View is made up of two separate corporate entities: Forest View Psychiatric Hospital, and Forest View Psychiatric Hospital, Inc.

14.     Forest View's inpatient facility is comprised of 108 beds, with individual units for children, adolescents, and adults.

15.     Defendant Universal Health Services, Inc. ("UHS"), a publicly traded company, owns and manages Forest View Hospital.

16.     UHS is one of the national's largest hospital management companies.

17.     UHS's registered address is 619 W. Prospect St., Marshall, MI 49068.

18.     The physicians at Forest View Hospital are generally independent contractors. This includes the three main psychiatrists who round on the patients, including Defendant Jahandar Saifollahi, M.D.

19.     In addition to being a contractor with Forest View, Defendant Dr. Saifollahi (NPI 1497901110) owns and operates a private practice, Behavioral Health Care, P.C. ("BHC"), with his wife, Dr. Marjaneh Rouhani.

20.     BHC's registered address is PO Box 1596, Battle Creek, MI 49016.

21.     BHC has two office locations: 300 Country Pine Lane, Battle Creek, MI

49015 (where Dr. Rouhani works), and 1001 Medical Park Drive, Suite 213, Grand

Rapids, MI 49546 (where Dr. Saifollahi works).

22.     The Grand Rapids location is literally next door to Forest View Hospital; the

building is owned by the hospital, and Dr. Saifollahi leases it from Forest View

Hospital.

23.     Relator Heidi Parent-Leonard, LMSW has over 20 years of experience as a

case manager for the mentally ill. From January 2016 through January 2018, she

was a case manager/therapist at Forest View Hospital.

24.     As one of 7-10 case managers, she had regular case load of approximately

10 or more patients whom she would see 3 times per week on average.

25.     Her job entailed assessing the patient, developing a treatment plan, getting a

release and contacting family members, and perform discharge planning, including

finding outpatient providers who could prescribe and refill their psychiatric

medications.

## GOVERNMENT HEALTHCARE PROGRAMS

26.     Title XVIII of the Social Security Act, U.S.C. §§ 1395 *et seq.,* establishes

the Health Insurance for the Aged and Disabled Program, known as the Medicare

program. The Secretary of the United States Department of Health and Human

Services ("HHS") administers the Medicare Program through the Centers for

Medicine and Medicaid Services ("CMS").

27.    The Medicare program is comprised of four parts. Medicare Part A ("Hospital Insurance") provides basic insurance for the costs of hospitalization and post hospitalization care. 42 U.S.C. §§ 1395c-i-5. Medicare Part B ("Medical Insurance") is a federally subsidized, voluntary insurance program that covers the fee schedule amount for doctors' services, outpatient care, medical supplies, and laboratory services. 42 U.S.C. §§ 1395j-w-5. Medicare Part C ("Medicare Advantage Plans") is a plan offered by private insurers that contract with Medicare to provide Part A and Part B benefits. 42 U.S.C. §§ 1395w-21-w-28. Medicare Part D ("Prescription Drug Coverage") is a plan offered by private insurers approved by Medicare to provide basic insurance for prescription drugs. 42 U.S.C. §§ 1395w-101-w-154.

28.    Reimbursement for Medicare Part B claims is made by the United States through CMS. CMS, in turn, contracts with fiscal intermediaries to administer and pay Medicare Part B claims from the Medicare Trust Fund. 42 U.S.C. § 1395(u). In this capacity, the fiscal intermediaries act on behalf of CMS. 42 C.F.R. § 421.5(b). Separate payments are made for each CPT procedural code listed on the Medicare Part B claims. *See* 45 C.F.R. §§ 162.1000, 162.1002, 162.1011, adopting the Current Procedural Terminology Coding Manual published by the American Medical Association (the "CPT Manual").

6

29.     Reimbursement for Medicare Part C claims is made by the United States through CMS. CMS makes fixed monthly payments to each Medicare Choice organization for each enrolled individual, i.e., a capitated payment.

30.     Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 *et seq.*, establishes the Medicaid program, a federally assisted grant program for the States. Medicaid enables the States to provide medical assistance and related services to needy individuals. CMS administers Medicaid on the federal level. Within broad federal rules, however, each state decides who is eligible for Medicaid, the services covered, payment levels for services and administrative and operational procedures.

31.     At all times relevant to this Complaint, the United States provided funds to the States through the Medicaid program pursuant to Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 *et seq.* Enrolled providers of medical services to Medicaid recipients are eligible for payment for covered medical services under the provisions of Title XIX of the 1965 Amendments to the Federal Social Security Act.

32.     Medicaid also provides funding to countywide community mental health service programs.

33.     TRICARE is a government-funded program that provides medical benefits to retired members of the Uniformed Services and to spouses and children of active

duty, retired, and deceased members, as well as reservists who were ordered to active duty for thirty (30) days or longer. The program is administered by the Department of Defense and funded by the federal government.

34.    Veterans of the United States military receive insurance benefits ("VA Insurance") through the Veterans Health Administration, a component of the U.S. Department of Veterans Affairs.

35.    The Federal Employees Health Benefits Program ("FEHBP") provides healthcare benefits for qualified federal employees and their dependents. Under the FEHBP, the federal employee is covered by private payer health insurance which is in turn subsidized in part by the federal government.

36.    The Office of Workers' Compensation Programs ("OWCP") of the U.S. Department of Labor ("DOL") administers federal workers' compensation programs under four statutes: (1) the Federal Employees' Compensation Act ("FECA"), 5 U.S.C. §§ 8101 *et seq*.; (2) the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. §§ 901 *et seq*.; (3) the Federal Black Lung Benefits Act ("FBLBA"), 30 U.S.C. §§ 901 *et seq*.; and (4) the Energy Employees Occupational Illness Compensation Program Act ("EEOIC") (also known as the "Beryllium Exposure Compensation Act"), 42 U.S.C. §§ 7384 *et seq*.

37.    Together, the programs described above, and any other government-funded healthcare programs, are referred to herein as "Government Healthcare Programs."

38.    Forest View bills for inpatients under Medicare Part A or other Government
Healthcare Programs at a capitated rate.

39.    Dr. Saifollahi and the other providers at Forest View bill for services
rendered under Medicare Part B or other Government Healthcare Programs under
fee-for-service CPT codes, such as the codes for hospital inpatient E/M services,
99221-99223 (initial care) or 99231-99233 (subsequent care), or 99238-99239 for
the hospital discharge day management.

40.    At BHC, Dr. Saifollahi bills Medicare Part B or Government Healthcare
Programs under fee-for-service codes 99201-99205 for new patient visits, 99211-
99215 for established patient visits, and the respective codes for any other
psychotherapy services provided.

## THE FEDERAL STARK LAW

41.    Section 1877 of the Social Security Act (42 U.S.C. § 1395nn), also known
as the physician self-referral law and commonly referred to as the "Stark Law,"
prohibits a physician from making referrals for certain designated health services
("DHS"), including inpatient and outpatient services, payable by Medicare or
Medicaid to an entity with which the physician has a financial relationship, unless
an exception applies.

42.    In enacting the statute, Congress found that improper financial relationships
between physicians and entities to which they refer patients can compromise the

physician's professional judgment as to whether an item or service is medically

necessary, safe, effective, and of good quality. Congress relied on various

academic studies consistently showing that physicians who had financial

relationships with medical service providers used more of those providers' services

than similarly situated physicians who did not have such relationships. The statute

was designed specifically to reduce the loss suffered by the Medicare Program due

to such increased questionable utilization of services, but the Stark Law also

applies to Medicaid claims. *See generally United States v. Rogan*, 459 F. Supp. 2d

692, 722-23 (N.D. Ill. 2006).

43.     Under the Stark Law, a physician is prohibited from making referrals to an

entity with which he or she has a financial relationship for DHS payable by

Medicare or Medicaid. In addition, providers may not bill Medicare or Medicaid

for DHS furnished as a result of a prohibited referral, and no payment may be

made by the Medicare or Medicaid programs for DHS provided in violation of 42

U.S.C. § 1395nn(a)(1). See 42 U.S.C. §§ 1395nn(g)(1), 1396b(s).

44.     Under the Stark Law, unless the relationship falls under a Safe Harbor, "a

physician who has a direct or indirect financial relationship with an entity, or who

has an immediate family member who has a direct or indirect financial relationship

with the entity, may not make a referral to that entity for the furnishing of DHS for

which payment otherwise may be made under Medicare…. [A] referral made by a

physician's group practice, its members, or its staff may be imputed to the physician if the physician directs the group practice, its members, or its staff to make the referral or if the physician controls referrals made by his or her group practice, its members, or its staff." 42 C.F.R. § 411.353(a).

45.    "No Medicare payment may be made for a designated health service that is furnished pursuant to a prohibited referral." 42 C.F.R. § 411.353(c).

46.    If a person collects payments billed in violation of 42 U.S.C. § 1395nn(a)(1), that person must refund those payments on a "timely basis," defined by regulation not to exceed 60 days. *See* 42 U.S.C. § 1395nn(g)(2); 42 C.F.R. § 411.353(d); 42 C.F.R. § 1003.101.

47.    The Stark Law broadly defines prohibited financial relationships to include a direct or indirect "ownership or investment interest in the entity" or a direct or indirect "compensation arrangement," i.e., any remuneration between a physician and an entity. *See generally* 42 C.F.R. § 411.354(a)(1).

48.    "Compensation arrangements" consist of any remuneration between a physician and an entity. 42 C.F.R. § 411.354(c). Like ownership interests, compensation arrangements can be direct or indirect. A direct compensation arrangement exists if there is no intervening person between the physician (or a member of his or her immediate family) and the entity providing the service. An indirect relationship exists if there is an unbroken chain of persons or entities that

have financial relationships (either an ownership or investment interest or a compensation arrangement), between the referring physician (or immediate family member) and the entity conducting the tests, if the referring physician receives compensation varying with volume or value of referrals, and if the entity furnishing the lab test has actual knowledge, or acts in reckless disregard or deliberate ignorance, of the fact that the referring physician is receiving compensation varying with the volume or value of referrals. 42 C.F.R. § 411.354(b)(5), (c)(2).

49.    Once the government has demonstrated each element of a violation of the Stark Law, the burden shifts to the defendant to establish that defendant's conduct at issue was exempted from the Stark Law, i.e., was protected by a Safe Harbor.

50.    Violations of the Stark Law may subject the physician and the billing entity to exclusion from participation in Government Health Care Programs and various financial penalties, including: (a) a civil money penalty of up to $15,000 for each service included in a claim for which the entity knew or should have known that the payment should not be made; and (b) an assessment of three times the amount claimed for a service rendered pursuant to a referral the entity knows or should have known was prohibited. See 42 U.S.C. §§ 1395nn(g)(3), 1320a-7a(a).

51.    TRICARE will likewise deny any claim where an individual contracted to the United States Government has the "apparent or actual opportunity to exert,

12

directly or indirectly, any influence on the referral of [TRICARE] beneficiaries to himself/herself or others with some potential for personal gain or the appearance of impropriety." 32 C.F.R. § 199.9(d)(1). Claims subject to "conflict of interest" in this way will be denied. 32 C.F.R. § 199.9(d)(2).  For ease of reference, the Stark Statute and the TRICARE regulations will be referred to as "Stark Laws" in this Complaint.

## SERVICES MUST BE MEDICALLY NECESSARY AND PERFORMED ECONOMICALLY

52.     Reimbursement practices under all Government Healthcare Programs closely align with the rules and regulations governing Medicare reimbursement. The most basic reimbursement requirement under Medicare, Medicaid, and other Government Healthcare Programs is that the service provided must be reasonable and medically necessary. *See, e.g.,* 42 U.S.C. § 1395y(a)(1)(A) (Medicare does not cover items or services that "are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member."); 5 U.S.C. § 8902(n)(1)(A) (FEHBP will not cover any treatment or surgery that is not medically necessary); 32 C.F.R. § 199.6(a)(5)(TRICARE provider has an obligation to provide services and supplies at only the appropriate level and "only when and to the extent medically necessary."); 42 C.F.R. §§ 411.15(k)(1), 411.406; *Moore ex rel. Moore v. Reese*, 637 F.3d 1220, 1232 (11th Cir. 2011) ("Although the standard of 'medical necessity' is not explicitly

denoted in the Medicaid Act, it has become a judicially accepted component of the federal legislative scheme."); *United States v. Rutgard*, 116 F.3d 1270, 1275-76 (9th Cir. 1997) (holding that TRICARE and the Railroad Retirement Health Insurance Program follow the same rules and regulations as Medicare, citing, *e.g.*, 32 C.F.R. § 199.4(a)(1)(i)).

53.     Healthcare providers must certify that services or items ordered or provided to patients will be provided "economically and only when, and to the extent, medically necessary" and "will be of a quality which meets professionally recognized standards of health care" and "will be supported by evidence of medical necessity and quality." 42 U.S.C. § 1320c-5(a)(1)-(3); see also 32 C.F.R. § 199.6(a)(5) (TRICARE services and supplies must "meet[] professionally recognized standards of health care [and be] supported by adequate medical documentation . . . to evidence the medical necessity and quality of services furnished, as well as the appropriateness of the level of care").

54.     These requirements prohibit defendants from manipulating billing procedures in "an intentionally wasteful manner" that maximizes their own economic benefit while providing no patient benefit. *United States ex rel. Kneepkins v. Gambro Healthcare, Inc.*, 115 F. Supp. 2d 35, 41-42 (D. Mass. 2000). Thus, "while there is no requirement that the least costly alternative treatment be used," requests for payment become false when they are the result of "policies to

artificially (i.e., unreasonably and unnecessarily) increase the quantity of items and amount of services provided to their patients without regard to medical necessity." *United States ex rel. Vainer v. Davita, Inc.*, 2012 WL 12832381, at *6 (N.D. Ga. Mar. 2, 2012).

55.     Providers who wish to be eligible to obtain Medicare reimbursement must certify, *inter alia*, that they agree to comply with the Medicare laws, regulations and program instructions that apply to them, and that they acknowledge, *inter alia*, that payment of claims by Medicare is conditioned upon the claim and the underlying transaction complying with all applicable laws, regulations, and program instructions. *See, e.g.,* Form CMS-855A (for institutional providers); Form CMS-855S, at 24 (for certain suppliers); Form CMS-855I (for physicians and non-physician practitioners).

56.     Claims submitted by healthcare providers to Government Healthcare Programs contain similar representations and certifications. *See, e.g.*, Forms CMS-1500 (paper provider claim form used for Medicare, Medicaid, TRICARE, FEHBP and OWCP); 837P (electronic version of form 1500); 1450 (UB04 – institutional provider paper claim form used for Medicare and Medicaid); 837I (electronic version of form 1450). When submitting a claim for payment, a provider does so subject to and under the terms of his certification to the United States that the services were delivered in accordance with federal law, including, for example, the

relevant Government Healthcare Program laws and regulations. Government Healthcare Programs require compliance with these certifications as a material condition of payment, and claims that violate these certifications are false or fraudulent claims under the False Claims Act. CMS, its fiscal agents, and relevant State health agencies will not pay claims for medically unnecessary services or claims for services provided in violation of relevant state or federal laws.

## FACTUAL ALLEGATIONS

### Upcoding Services Performed on Inpatients at Forest View

57.    Dr. Saifollahi bills for nearly every new inpatient visit under either CPT Code 99222 or 99223, and then bills for nearly every established inpatient visit under 99232.

58.    Not only is this statistically impossible—that every single visit should require a level 2 examination with moderate complexity—but Ms. Parent-Leonard witnessed firsthand that this billing was fraudulent.

59.    Although there are three doctors rounding on the patients at Forest View, most of the patients were assigned to Dr. Saifollahi.

60.    He demands that as many patients be assigned to him as possible, so that he can not only bill for them, but then also self-refer them to his private practice and sessions under the "partial hospitalization program" (PHP) (discussed below) when they are discharged.

16

61.    Although he bills the visits under CPT Code 99232, which typically requires 25 minutes per visit, he regularly sees 30-45 patients per day.

62.    Whereas the common practice—for the other two doctors and at other hospitals Relator has worked at—is to locate and speak with one patient at a time, spending as much time as necessary to assess their progress, Dr. Saifollahi instructs the nurses and mental health workers to round up all his patients at one time and have them line up in the hallway outside a group room.

63.    Relator estimates that he then spends on average approximately five minutes talking to each patient.

**Billing for Services Not Performed and Without Proper Documentation**

64.    The Forest View nurses frequently complained to Relator and one another that Dr. Saifollahi would prepare progress notes and change medications without meeting with the patients.

65.    On one occasion, one of the other psychiatrists told Relator that when he had to cover Dr. Saifollahi's patients in the partial hospitalization program, there was no documentation for the patients, not even information about their prescribed medications; he had to ask the patients to bring their prescription bottles in to their meetings so he could manage their care properly.

66.    Relator witnessed Dr. Saifollahi lacking documentation at daily meetings.

67.    Each morning, the three doctors would have separate "team meetings" with their utilization manager, case managers, and the supervising nurse to discuss each of their inpatients, such as progress, changes to medication, discharge, etc.

68.    Dr. Saifollahi resented having to be at this meeting, and unless a patient had experienced a significant change, Dr. Saifollahi would have nothing to say and in fact refused to discuss the patient.

69.    If case managers asked why certain improving patients were not being discharged, Dr. Saifollahi would usually respond "they are paranoid" and refuse to discuss further.

70.    On one occasion, Relator pressed him for answers when a Medicare beneficiary's sister raised concerns that her sister was not improving. Dr. Saifollahi "fired her" from being the case manager for his patients.

**Questionable Outpatient Billing**

71.    When Dr. Saifollahi provides psychotherapy to his patients, he routinely bills it as the highest level (CPT Code 90838, 60+ minutes), and in conjunction with E/M service codes (99213-99215), and the psychotherapy code for "interactive complexity" (90785).

72.    The MAC for the state of Michigan—Wisconsin Physicians Service Insurance Corporation—issued LCD L34616: Psychiatry and Psychology Services, effective October 1, 2015. Per L34616, in order to bill for both E/M and

psychotherapy on the same visit, "the two services must be significant and separately identifiable." Also:

> 1.    The type and level of E/M service is selected first based upon the key components of history, examination, and medical decision-making.
> 2.    Time associated with activities used to meet criteria for the E/M service is not included in the time used for reporting the psychotherapy service (i.e., time spent on history, examination, and medical decision making when used for the E/M service is not psychotherapy time). Time may not be used to determine E/M code selection.

73.    L34616 defines "interactive complexity" as "communication difficulties during the psychiatric procedure" and requires the following coverage indications:

> The medical record for interactive complexity reported with the psychiatric procedures must indicate that the person being evaluated does not have the ability to interact through normal verbal communicative channels, include adaptations utilized in the session and the rationale for employing these interactive techniques, and recommendations for future care.

74.    Similarly, the Michigan Medicaid Provider Manual, § 2.5, defines interactive psychotherapy as:

> [T]he use of physical aids and nonverbal communication to overcome barriers to therapeutic interaction between the clinician and a beneficiary who has not yet developed, or has lost, either the expressive language communication skills to explain their symptoms and response to treatment, or the receptive communication skills to understand the clinician if they would use ordinary adult language for communication.

75.    It is highly unlikely that most, if not all, of the patients receiving psychotherapy services from Dr. Saifollahi (a) required a significant and separately

19

identifiable E/M visit with every psychotherapy session, (b) stayed for the 85-105 minutes required to bill both the E/M and the psychotherapy, and (c) lacked the ability to conduct normal verbal communication.

76.     Under the 2018 Medicare fee schedule for Locality 0820299 (rest of Michigan), the non-facility prices for each code are as follows:

> 99213 - $71.23
> 99215 - $142.33
> 90837 - $131.22
> 90838 - $113.55
> 90785 - $14.56

77.     Thus if Dr. Saifollahi were merely performing psychotherapy (and actually did so for 60 minutes), he should be billing under code 90837, paid $131.22.

78.     By billing for psychotherapy (90838) *and* E/M *and* interactive complexity, he is paid $199.34-$270.44 (depending on which E/M code is used).

79.     Moreover, the psychotherapy and outpatient E/M billing are likely upcoded as well.

80.     Patients frequently told Relator that Dr. Saifollahi routinely double and triple-booked them so that, like in the hospital, they were in-and-out in a matter of minutes.

81.     It would be impossible for Dr. Saifollahi to handle all of the 35-40 inpatient E/M (25 minutes each), 10 PHP patients, the outpatient E/M (15 or 40 minutes each), and the psychotherapy sessions (60 minutes each) that he was billing.

**Self-Referring Forest View Inpatients to Outpatient Care**

82.     When Dr. Saifollahi discharges patients from Forest View, he routinely refers them to himself to PHP, as well as to his own practice next door, BHC.

83.     Whereas the other psychiatrists at Forest View would refer patients to PHP only if they felt it would benefit the patient, Dr. Saifollahi routinely refers all of his patients to PHP, without regard for their needs.

84.     PHP is an outpatient version of the Forest View's inpatient services: the patients come to Forest View in the morning, attend classes and group therapy, see the psychiatrist, and meet with their case manager, before returning home.

85.     After meeting with the 30-40 inpatients, Dr. Saifollahi meets with about 10 of these PHP patients, before going to his practice next door.

86.     Such self-referrals are expressly prohibited by the Stark Law. *See* 42 C.F.R. § 411.351, defining "outpatient hospital services" as including "partial hospitalization services listed under sections 1861(s)(2)(B) and (s)(2)(C) of the Act" and "outpatient services furnished by a psychiatric hospital, as defined in section 1861(f) of the Act); *see also* 42 C.F.R. § 410.43 (partial hospitalization services).

87.     In Relator's experience, a "partial discharge" from inpatient to outpatient is routine for psychiatric hospitals, since it allows the patient to return home while still enabling them to seek comprehensive treatment, but different psychiatrists are

assigned to the patient for their inpatient and outpatient therapies, removing the risks and incentives of self-referrals.

88.     Moreover, Dr. Saifollahi abuses his position as an authority figure at Forest View by convincing patients that it is a privilege to continue being treated by him after their discharge.

89.     Although he is one of three contracted physicians at Forest View, Dr. Saifollahi acts as if he is the "head" psychiatrist, believing that the staff should assign him the most patients and generally acting as if he were in charge.

90.     Another case worker told Relator about one instance where she refused to refer a patient to Dr. Saifollahi, and so he tore up the patient's discharge document.

91.     Dr. Saifollahi's self-promotion and reckless self-referral practices can be detrimental to the patients.

92.     Dr. Saifollahi has threatened patients who did not want to be a part of the partial hospitalization program.

93.     Relator recalls one patient whom Dr. Saifollahi threatened to readmit to the inpatient unit if he did not agree to PHP. The patient told Relator that Dr. Saifollahi had threatened to have him picked up by the police if he did not attend the PHP.

94.     On another occasion, a patient told Relator that Dr. Saifollahi conditioned his Adderall prescription on attending PHP.

95.    On yet another occasion, Dr. Saifollahi told a patient that he would not allow the patient to be admitted to Forest View again unless he agreed to attend private sessions at his office. The patient was already being treated by a community case management agency funded by Kent County Community Mental Health Authority. That agency, Cherry Health, provides a team of professionals including a psychiatrist, case manager, and therapist, all of whom coordinate his care. Changing his provider to Dr. Saifollahi would have required him to forgo the treatment team.

**Improper Referrals and Admissions of Medicare Beneficiaries to Forest View**

96.    Conversely, Dr. Saifollahi also refers his private practice Medicare patients to Forest View Hospital, in violation of the Stark Law. *See* 42 C.F.R. § 411.35 (defining "inpatient hospital services" under Stark Law as including "inpatient psychiatric hospital services listed in section 1861(c) of the Act").

97.    Specifically, if one of his outpatients has Medicare coverage, he recommends that they check themselves into Forest View, telling them that Medicare will cover their stay.

98.    Often these patient did not need or qualify for inpatient treatment.

99.    Relator recalls three Medicare beneficiaries in particular who would check in and out of Forest View at Dr. Saifollahi's suggestion who did not require inpatient care:

100.   Patient AB was a substance abuse patient improperly admitted to Forest View by Dr. Saifollahi. He lived in a motel, and so Forest View accepted him as a patient until his benefits were exhausted.

101.   Patient AZ was a substance abuse patient improperly admitted to Forest View by Dr. Saifollahi. He admitted to Relator that he was not sure why he was admitted, but that Dr. Saifollahi had told him to go to the hospital to readjust his medications.

102.   Patient CR was a substance abuse patient improperly admitted to Forest View by Dr. Saifollahi. Nurses would frequently ask "why is she even here?" and she once heard her at the nurse's station saying "I don't know why he [Dr. Saifollahi] put me here.

103.   There was also a belief among the nurses and social workers that Dr. Saifollahi would adjust, or refuse to adjust, patients' medications so that their stay at Forest View was prolonged until their benefits were exhausted.

## COUNT I
## VIOLATION OF 31 U.S.C. § 3729 – FALSE CLAIMS ACT

104.   Relator hereby incorporates and realleges herein all other paragraphs as if full set forth herein.

105.   As set forth above, Defendants, by and through their agents, officers, and employees, knowingly presented, or caused to be presented to the United States

Government numerous false or fraudulent claims for payment or approval, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

106.   Due to Defendants' conduct, the Government has suffered substantial monetary damages.

107.   The United States is entitled to treble damages based upon the amount of damage sustained by the United States as a result of the aforementioned violation of the False Claims Act, 31 U.S.C. §§ 3729-3733, in an amount that will be proven at trial.

108.   The United States is entitled to a civil penalty as required by 31 U.S.C. § 3729(a) for each of the fraudulent claims.

109.   Relator is entitled to a reasonable attorney's fees and costs, pursuant to 31 U.S.C. § 3730(d)(1).

## COUNT II
### VIOLATION OF MICHIGAN COMPILED LAWS 400.603 § 7 – MICHIGAN MEDICAID FALSE CLAIMS ACT

110.   Relator hereby incorporates and realleges herein all other paragraphs as if full set forth herein.

111.   As set forth above, Defendants, individually and by and through their agents, officers, and employees, knowingly made, presented, or caused to be made or presented, to the Michigan Medicaid program claims known to be false, in violation of Mich. Comp. Laws 400.607(1).

112. Due to Defendants' conduct, the State of Michigan has suffered substantial monetary damages.

113. The State of Michigan is entitled to treble damages based upon the amount of damage sustained by the State of Michigan as a result of the aforementioned violations of the Mich. Comp. Laws 400.612(1), an amount that will be proven at trial.

114. The State of Michigan is entitled to a civil penalty as required by Mich. Comp. Laws 400.612(1) for each of the fraudulent claims.

115. Relator is also entitled to reasonable expenses which the court finds to have been necessarily incurred and reasonable attorneys' fees and costs, pursuant to Mich. Comp. Laws 400.610a(9).

## **PRAYER FOR RELIEF**

**WHEREFORE,** Relator prays for judgment:

(a) awarding the United States treble damages sustained by it for each of the false claims;

(b) awarding the United States the maximum civil penalty for each false claim;

(c) awarding the State of Michigan treble damages sustained by it for each of the false claims;

(d) awarding the State of Michigan the maximum civil penalty for each of the false claims;

26

(e) awarding Relator 30% of the proceeds of this action and any alternate

    remedy or the settlement of any such claim;

(f) awarding Relator litigation costs and reasonable attorney's fees; and

(g) granting such other relief as the Court may deem just and proper.

### **DEMAND FOR JURY TRIAL**

    Relator hereby respectfully demands trial by jury on all issues and counts

triable as of right before a jury.

Respectfully submitted,

Jason Marcus
Georgia Bar No. 949698
**BRACKER & MARCUS LLC**
3225 Shallowford Road, Suite 1120
Marietta, GA 30062
Tel. (770) 988-5035
Fax (678) 648-5544
Jason@FCAcounsel.com





FILE UNDER SEAL

$3.100
US POSTAGE
FIRST-CLASS
0625000342777
30062
90149838
stamps

BRACKER & MARCUS LLC
3225 Shallowford Road Suite 1120 | Marietta GA |30062

To:  United States District Court
Attn: Clerk of the Court
399 Federal Bldg.
110 Michigan St., NW
Grand Rapids, MI 49503